IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENNETH O'CONNOR** | : | **CIVIL ACTION** |
| *Petitioner-pro se* | : | |
| | : | **NO. 15-1651** |
| **v.** | : | |
| | : | |
| **NANCY GIROUX,** *et al.* | : | |
| *Respondents* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                   DECEMBER 6, 2016

# MEMORANDUM OPINION

**INTRODUCTION**

      Petitioner Kenneth O'Connor ("Petitioner"), a Pennsylvania state prisoner acting *pro se,* filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, in which he asserts that the Commonwealth of Pennsylvania ("Commonwealth"), as the prosecutor, violated his constitutional rights by withholding exculpatory evidence of an eyewitness contrary to *Brady v. Maryland*, 373 U.S. 83 (1963). [ECF 1]. In accordance with Title 28 U.S.C § 636(b) and Local Civil Rule 72.1.IV(c), the petition was referred to United States Magistrate Judge Henry S. Perkin for a *Report and Recommendation* ("R&R"). [ECF 2]. On April 21, 2016, Magistrate Judge Perkin issued an R&R, which recommended that the petition for a writ of *habeas corpus* be denied. [ECF 17]. Petitioner has filed objections to the R&R. [ECF 19]. The matter before this Court is, therefore, ripe for disposition.

      Upon a thorough and independent *de novo* review of the state record and court filings, for the reasons stated herein, this Court overrules Petitioner's objections, approves and adopts the R&R, and denies the petition for a writ of *habeas corpus*.

**BACKGROUND**

On September 16, 2008, Petitioner was tried with co-defendant Patrick Horgan, without a jury before the Honorable M. Teresa Sarmina in the Philadelphia Court of Common Pleas, and found guilty of murder of the third degree. The facts underlying Petitioner's conviction were summarized by the Superior Court and quoted in the R&R as follows:

> On March 3, 2007, [Appellant] and codefendant [Patrick] (Horgan) were involved in an altercation with Jonathan Johnson (victim) in the victim's home. After the victim was knocked unconscious, [Appellant] and Horgan took turns stomping on the victim's head; the victim was hospitalized and died of blunt force trauma to the head five days later. The relevant events began twenty-four hours earlier.
>
> On March 2, 2007, [Appellant] and Horgan spent the day consuming drugs and large amounts of alcohol at an apartment complex located at 8225 Roosevelt Boulevard in Philadelphia with some of the residents, "Eileen," Angela Mancini, and "Anna." At some point during the evening, Horgan lost his wallet. While he was leaving the apartment on the second floor, he realized he did not have it. Horgan believed "Anna," a second-floor resident, had stolen it; he became enraged and furiously banged on her door, telling her to return it. Then, [Appellant] found Horgan's wallet at the bottom of the staircase of the public hallway and returned it to him. [Appellant and Horgan] and Angela Mancini left the apartment building, and walked south down Roosevelt Boulevard. Shortly thereafter, in the early morning of March 3, 2007, [Appellant and Horgan] were stopped by Philadelphia Police Officer James Strohm, who was responding to a call about a disturbance at 8223 or 8225 Roosevelt Boulevard.
>
> When Officer Strohm questioned Horgan as to why he was at the apartment building, Horgan replied that he was there "to kick the s[* *]t out of the n [* *]er for breaking his girlfriend's leg." [Appellant] also said that he was there to "beat the s[* *]t out of him too." As he spoke to them, Officer Strohm smelled alcohol on the two men's breath. Officer Strohm discovered that [Appellant and Horgan] had outstanding warrants for their arrest, and took them into custody. When they arrived at the Eighth Police District to be processed for their summary warrants, Horgan was still agitated about his wallet. When Officer James Gillespie asked Horgan to remove all items from his person, he threw his wallet on the table and stated that there was nothing inside it because "the f[* *]king sp[*]c b[* *]ch took my money and I'm going to go back and get them—going to go back and kill them."
>
> [Appellant and Horgan] were released from police custody between 7:30 and 8:00 a.m. on March 3, 2007. They then proceeded to walk back to 8225 Roosevelt

Boulevard to find Horgan's wallet, because he once again claimed it was missing. Although he wanted to go home, [Appellant] decided to stay with Horgan.

[Appellant] and Horgan returned briefly to the first-floor apartment occupied by "Eileen" and Ms. Mancini, then left, bought a case of beer, and drank six cans each at the park. They next bought some pizza and went to [Appellant's] friend's house to drink some more beer. Between 2:00 and 3:00 p.m. [Appellant and Horgan] left the house, picked up vodka, and mixed ice tea, which they bought at the Acme [Market] with the vodka. They drank this on a picnic table with Peter Fedorin, whom they ran into at the Acme. [Appellant and Horgan] separated from Mr. Fedorin and eventually decided to go to the victim's house to "get off the street."

At approximately 5:00 on the evening of March 3, 2007, they arrived at the victim's apartment, located at 8223 Roosevelt Boulevard, right next door to the apartment where the previous evening's events had occurred. [Appellant and Horgan] rang the victim's bell and he walked down the stairs to open the security door. But, before allowing them upstairs to his apartment, the victim asked [Appellant], "Pat is going to be cool, right[?]" [Appellant] responded, "Yeah, everything is going to be all right." The victim then opened the outer security door and the three men walked upstairs to [the victim's] studio apartment.

Once upstairs, they sat around the victim's wooden kitchen table. They drank vodka mixed with iced tea, drank beer, and smoked a bag of crack [Appellant] had bought the previous night. Peter Fedorin arrived approximately thirty minutes later with another bottle of vodka, which the four men shared. Meanwhile Ms. Joniec, the victim's girlfriend, was asleep in the next room of the studio apartment.

Horgan mentioned that he was frustrated over losing his wallet and stated, "I can't believe I lost my f[* * *]ing money." The victim told him to shut up. Angry at the victim's reaction, Horgan accused him of stealing his wallet and a loud argument ensued. The argument calmed down at first, but then escalated. Because the argument was "getting heated," Mr. Fedorin piped in and asked [Appellant] to stop the altercation.

[Appellant] separated Horgan and the victim by shoving each of them. The victim then assumed a karate stance and told [Appellant and Horgan] to leave his apartment. [Appellant] told the victim to "knock this s[* *]t off." The victim then hit [Appellant] with a jab on the side of the ear. [Appellant] wrapped his arms around the victim in a "headlock hug," and started wrestling with him. They continued wrestling and fell onto the wooden kitchen table, causing it to collapse.

During their fall, [Appellant] landed on the victim. [Appellant] allowed the victim to stand up. A fist fight then broke out between the victim and [Appellant and Horgan]. The victim defended himself, fought back with his fists, and fell down a

3

few times. He later grabbed one of the legs from the broken table (the table leg), raised it over his shoulder in a batting stance, and again told [Appellant and Horgan] to leave his apartment. He also shouted at Ms. Joniec, who was now awake, to get his gun from the closet.

Meanwhile, the victim struck [Appellant] in the head with the table leg, causing [Appellant] to fall near Mr. Fedorin—who remained seated on a stool throughout the ensuing fight. Horgan picked up a chair and struck the victim on his side once, causing the victim to loosen his grip on the table leg. [Appellant] grabbed the table leg and started beating the victim's head with it, and the victim collapsed. The victim was unconscious and was bleeding from his head. While the victim was unconscious on the ground, [Appellant] and Horgan took turns stomping on his head.

Ms. Joniec began screaming and telling [Appellant and Horgan] to stop because the victim was unconscious. Horgan pulled [Appellant] towards the front door. However, [Appellant] yanked his arm away from Horgan's grip and stomped down on the victim's head one last time before finally leaving the apartment.

Once [Appellant and Horgan] left, Ms. Joniec ran to the fire station next door to get help. On her way out of the apartment, Ms. Joniec saw Horgan trying to get back into the apartment—kicking the outer door and ringing all of the doorbells. Horgan was screaming that the victim "hadn't had enough yet." Horgan warned Ms. Joniec "not to say anything or he'd kill [her]." When Ms. Joniec returned from the fire station with a medic, [Appellant and Horgan] were gone.

The victim was taken to the hospital on March 3, 2007 and was pronounced dead on March 8, 2007. Dr. Bennett Preston, an expert in forensic pathology, testified to a reasonable degree of medical certainty that the cause of death was "multiple blunt force injuries to the head." In particular, two skull fractures caused cerebral hemorrhaging, which affected the victim's breathing and eventually led to his death. Dr. Preston also testified that the victim had various lacerations and abrasions on the head and back that were consistent with having been stomped on and having been struck with a table leg.

*Commonwealth v. O'Connor*, 2014 WL 10786855, at *1-3 (Pa. Super. Ct. Dec. 24, 2014) (alteration in original).

Following his conviction, Petitioner was sentenced on October 30, 2008, to a term of eight to twenty years imprisonment, followed by 20 years probation. Petitioner filed a timely post-sentence motion, which the trial court denied on March 9, 2009. Petitioner filed a direct appeal with the Pennsylvania Superior Court. On May 17, 2010, the Superior Court rejected

4

Petitioner's claims, and affirmed the judgment of sentence. *See Commonwealth v. O'Connor*, 4 A.3d 194 (Pa. Super. Ct. May 17, 2010). Petitioner filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which was denied on October 26, 2010. *See Commonwealth v. O'Connor*, 9 A.3d 628 (Pa. 2010). Petitioner did not seek a writ of certiorari from the United States Supreme Court.

On October 11, 2011, Petitioner filed a *pro se* petition for collateral review under the Pennsylvania Post Conviction Relief Act ("PCRA"). Counsel was appointed, and on May 24, 2012, PCRA counsel filed an amended petition. Following an evidentiary hearing on Petitioner's PCRA claims, on November 30, 2013, the PCRA court dismissed the petition. By memorandum decision dated December 24, 2014, the Superior Court affirmed the PCRA court's dismissal. *See Commonwealth v. O'Connor*, 2014 WL 10786855 (Pa. Super. Ct. Dec. 24, 2014).

On March 31, 2015, Petitioner filed the underlying *pro se* petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. [ECF 1]. In his *habeas* petition, Petitioner asserts that the Commonwealth withheld exculpatory evidence regarding a key eyewitness, Janice Joniec, in violation of the Commonwealth's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner contends that the Commonwealth withheld evidence that allegedly showed that Ms. Joniec was essentially coerced into testifying against Petitioner.

The *habeas* petition was referred to the Honorable Magistrate Judge Henry S. Perkin for a report and recommendation. [ECF 2]. After considering the parties' submissions and the underlying state court record, Magistrate Judge Perkin submitted a well-reasoned R&R which addressed Petitioner's *habeas* claims, and recommended that the petition be denied. Petitioner filed objections to the R&R, in which he essentially argues that the conclusion of the Magistrate

Judge is wrong.  For the reasons that follow, this Court disagrees, and approves and adopts the R&R.

**LEGAL STANDARD**

Where objections to an R&R are filed, the court must conduct a *de novo* review of the contested portions of the R&R, *see Sample v. Diecks*, 885 F.2d 1099, 1106 n. 3 (3d Cir. 1989) (citing 28 U.S.C. §636(b)(1)(C)), provided the objections are both timely and specific. *Goney v. Clark*, 749 F.2d 5, 607 (3d Cir. 1984).  In conducting its *de novo* review, a court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge.  28 U.S.C. §636(b)(1).  Although the review is *de novo*, the statute permits the court to rely on the recommendations of the magistrate judge to the extent it deems proper.  *United States v. Raddatz*, 447 U.S. 667, 675-76 (1980); *Goney*, 749 F.2d at 7.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") amended the standards for reviewing state court judgments raised in federal *habeas corpus* petitions filed under 28 U.S.C. § 2254.  *Werts v. Vaughn*, 228 F.3d 178, 195 (3d Cir. 2000).  AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts.  *Id*. at 196.  Thus, in accordance with § 2254(d), a *habeas corpus* petition may only be granted if the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

To establish that the state court decision was "contrary to" federal law, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court

6

precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999) (emphasis in original). Similarly, a federal court may only find a state court decision to be an "unreasonable application" of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id*. at 890. "[T]he requirements of 2254(d) are difficult to meet." *Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013). This section "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus to a state prisoner." *Id*. at 1094.

Further, factual determinations made by the state court are "presumed to be correct." 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with "clear and convincing evidence" of the state court's error. *Id*. "This presumption of correctness applies to factual determinations of both state trial and appellate courts." *Lewis v. Horn,* 581 F.3d 92, 111 (3d Cir. 2009). Consequently, a *habeas* petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." *Mastracchio v. Vose*, 274 F.3d 590, 597-98 (1st Cir. 2001).

**DISCUSSION**

As stated, in his *habeas corpus* petition, Petitioner claims that the Commonwealth withheld evidence regarding eyewitness Janice Joniec in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner contends that the Commonwealth suppressed evidence that the police "arrested her illegally" on the night before Petitioner's preliminary hearing, that the police "promised the benefit of release from jail if she cooperated with the Commonwealth," that the police "threatened to prosecute her with perjury if she refused to cooperate," and that corrections officers "threatened [her] with the disciplinary punishment of solitary confinement if

she refused to attend court." (Petitioner's Memorandum at 5, 10, 19, 20). The Pennsylvania Superior Court, on the appeal of the dismissal of Petitioner's PCRA petition, rejected this claim on the merits.

After carefully reviewing the entire record, the Magistrate Judge concluded that the Superior Court's determination that the allegedly suppressed coercion evidence regarding Ms. Joniec was not material, was correct, and was not an unreasonable application of Supreme Court precedent. In his objections to the R&R, rather than articulating a specific objection to the R&R, Petitioner repeats the identical arguments made in the *habeas* petition regarding the Commonwealth's alleged withholding of evidence that law enforcement officers essentially coerced a key eyewitness into providing incriminating testimony against him.

When addressing the merits of a *Brady* claim on *habeas* review, the applicable and "clearly established federal law" is the familiar test articulated by the Supreme Court in *Brady* and its progeny; *to wit*: that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." *Brady*, 373 U.S. at 87. "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Under the *Brady* progeny, the prosecution has an affirmative "duty to disclose such evidence . . . even though there has been no request [for the evidence] by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted). This affirmative obligation "encompases evidence 'known only to police investigators and not to the prosecutor.'" *Id*. at 280-81 (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). However, the failure to disclose favorable evidence alone is not sufficient to establish a constitutional violation. *See Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013). A *habeas* petitioner is only entitled to relief when: "(1) the evidence at issue is

favorable to the accused; (2) the evidence was suppressed by the state; and (3) the evidence is material." *Id*.

The Third Circuit Court of Appeals summarized the "materiality" requirement of *Brady* as follows:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . Rather, the touchstone of materiality is a reasonable probability of a different result. The question is . . . whether in [the evidence's] absence [the petitioner] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.
>
> The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state. Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Id.* at 128-29 (citations and quotations omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 435.

Petitioner advances no argument in either his objections or the *habeas* petition that the Superior Court decision affirming the denial of PCRA relief, is contrary to extant United States Supreme Court precedent, or that the test applied by the state court was inconsistent with the test established in *Brady* and its progeny. Clearly, he cannot. When ruling on Petitioner's PCRA

appeal, the Pennsylvania Superior Court correctly considered and applied the governing test for *Brady* claims.  *See Commonwealth v. O'Connor*, 2014 WL 10786855, at *5-6 (Pa. Super. Ct. Dec. 24, 2014) (citing to and applying the *Brady* test to Petitioner's claim and concluding that the challenged evidence was not "material" as required to obtain post-conviction relief under *Brady*).  Therefore, its decision cannot be regarded as "contrary to" the test established in *Brady* and its progeny.

The dispositive question then becomes whether the Superior Court's opinion reflects an unreasonable application of the *Brady* test.  To meet his burden, Petitioner must demonstrate that the state court's decision evaluated on the merits objectively, resulted in an outcome that cannot reasonably be justified under *Brady*.  Here, the Superior Court determined that the allegedly suppressed coercion evidence regarding eyewitness Ms. Joniec was not "material," as required to grant *habeas* relief.  In reaching this conclusion, the Superior Court considered and summarized Ms. Joniec's testimony provided during the PCRA hearing, as follows:

> In this case, Joniec testified at the PCRA hearing that she told law enforcement on three occasions that she did not wish to testify in court.  The first instance was right before Appellant's preliminary hearing, but the detectives told her that "[she had] to go" to testify.  N.T., 11/20/13, at 9.  The second time was approximately one to two weeks before Appellant's trial.  Joniec asked one of the detectives what would happen if she refused to testify at Appellant's trial, and the detective responded that she would be charged with perjury.  *Id*. at 14.  The third instance was on the second day of Appellant's trial, where Joniec testified that a corrections officer informed her that if she did not get up to go testify, she would be placed in solitary confinement.  *Id*. at 16, 29.
>
> Joniec testified that the primary reason she did not wish to testify was because "[she has] social anxiety and it's really hard for [her] to get up in front of people." *Id*. at 20.  When Joniec does get up in front of a crowd she tends to "get panic attacks and [] get[s] sick." *Id*. at 20, 24.  Joniec testified that the detectives "treated [her] well." *Id*. at 23.  Joniec also agreed that they were nice to her. *Id*. Most importantly, Joniec testified that none of the conduct she

10

> described amounted to her feeling any pressure to lie at Appellant's trial. *Id*. at 29. To the contrary, Joniec confirmed at the PCRA hearing that her trial testimony, including her in-court identification of Appellant was "truthful." *Id*. at 32.
>
> As noted above, the Supreme Court has held that evidence is material under Brady when "the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith*, *supra*, quoting *Kyles*, *supra* at 434. We agree with the PCRA court that the undisclosed evidence was relevant to Appellant's trial, as it bore on Joniec's credibility. Nevertheless, the fact that said statements are relevant does not render them material under Brady. As the PCRA court observed, Joniec testified at the PCRA hearing that her testimony at trial was truthful, and the reason she did not want to come to court was solely because of her social anxiety about getting in front of crowds. N.T., 11/20/13, at 20, 24, 32. At best, "the officers influenced Joniec to appear in court, but [] the content of her testimony was unaffected." PCRA Court Opinion, 5/13/14, at 10.

*O'Connor*, 2014 WL 10786855, at *5-6.

As noted by the Superior Court, although Ms. Joniec testified that she told law enforcement that she did not wish to testify in court, she also testified that she did not feel any pressure from law enforcement to testify untruthfully, and that her testimony against Petitioner at trial was, in fact, truthful. In light of these assertions, this Court finds, as did the Magistrate Judge, that it was objectively reasonable for the Superior Court to conclude that the allegedly withheld evidence was not material to Petitioner's defense.

Assuming, however, as Petitioner would like this Court to do, that Ms. Joniec's appearance and testimony was coerced, other compelling evidence of Petitioner's guilt existed beyond that provided by Ms. Joniec. The Superior Court referenced another eyewitness, Peter Fedorin, who testified at trial that Petitioner and his accomplice beat the victim to death. This testimony was buttressed by Officer James Strohm, who testified that Petitioner was outside the victim's apartment shortly before the murder, and that Petitioner told the officer that he was there to "beat the s[**]t out of [the victim]." *Id*. at *6. Indeed, Petitioner conceded at trial that he was

11

in the victim's apartment when the victim was killed, and that he (Petitioner) pushed the victim, grabbed him and fell onto the kitchen table with him. (N.T. 9/12/08, at 232-235).

In light of the overwhelming evidence of Petitioner's guilt, this Court finds that even if the Commonwealth had produced the allegedly withheld evidence, it cannot be said that a reasonable probability exists that the outcome of the trial would have been different. As such, the Superior Court's decision on this issue is not contrary to or an unreasonable application of, clearly established federal law, nor is it an unreasonable determination of the facts. Therefore, finding no basis for relief, the *habeas corpus* petition is denied.

**CONCLUSION**

For the reasons stated herein, Petitioner's objections to the Report and Recommendation are overruled, the Report and Recommendation is approved and adopted, and Petitioner's petition for a writ of *habeas corpus* is denied. In addition, because reasonable jurists would not debate this Court's disposition of Petitioner's claims, a certificate of appealability is denied. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.